UNITED STATES OF AMERICA,

     Plaintiff,

v.                                                No. 1:18-cr-02208-JCH-1

FEDERICO MAZON

     Defendant.

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Federico Mazon's "Motion to Suppress Evidence Derived as a Result of an Invalid Search and Seizure and to Suppress Statements Obtained in Violation of *Miranda v. Arizona*, and Memorandum in Support Thereof," (ECF No. 28) and "Motion to Suppress Evidence Derived as a Result of a Warrantless and Unlawful Search of his Telephone and Memorandum in Support Thereof" (ECF No. 36). The Court held a hearing on the motions on March 10, 2020. Having considered the motions, briefs, evidence, arguments, and being otherwise fully advised, the Court rules as explained herein.

## I.    FACTUAL BACKGROUND

The Court makes the following findings of fact, as supported by the record, in accordance with Federal Rule of Criminal Procedure 12(d). In making its factual findings, the Court heard the testimony of Tony DeTavis and Eric Wilmeth, law enforcement officers with the New Mexico State Police's Automobile Theft Suppression Unit, whom

the Court finds credible and finds have specialized knowledge through their training and experience with automobile theft and drug trafficking practices and recognition of illegal narcotics. *See* Motion to Suppress Hearing Transcript 7:22-24 – 9:1-21; 87:24-25 – 88:23 – 90:1-20 (Mot. Hr'g. Tr.).

On the night of March 31, 2018, DeTavis and Wilmeth patrolled the streets of southeast Albuquerque in their unmarked police truck. *Id*. 10:21-22; 42:10. Near the intersection of Louisiana Boulevard and Central Avenue, they saw a silver Nissan with a temporary registration tag that was torn and difficult to see because the numbers were covered by tape. *Id*. 10:25 – 11:1-3; 12:23-25; Govt.'s Exs. 1, 2, 6. When officers queried the temporary tag through law enforcement databases, it was reported as "record not on file," meaning that "the [Motor Vehicle Department did not] have a record of the vehicle." Mot. Hr'g. Tr. 11:3-5; 33:10-12.

So the officers activated their police lights and sirens to stop the vehicle. *Id*. 11:18-19. The driver, Defendant, slowed down to a rate of speed of about 10 to 15 miles per hour, but nonetheless continued driving more than one-half of a mile and passed six or seven avenues on which he could have safely turned off before finally stopping. *Id*. 11:20-25 – 12:1-3; 13:10-24; 57:5. Officer DeTavis testified that based on his training, when a driver does not immediately stop in response to police commands, it is typically because the person is hiding contraband inside the car or planning to flee. *Id*. 14:5-10.

Once the vehicle stopped, Wilmeth approached the driver's door while DeTavis approached the vehicle's passenger door. *Id*. 15:1-5. At this point, other marked law enforcement officers were on the scene. *Id*. 14:17-24. Defendant was in the driver's seat

and a female was in the passenger seat. *Id.* 15:6-8. Wilmeth requested Defendant's license, registration, and proof of insurance. *Id.* 15:12-13.

As Defendant opened the glovebox, he "began to reach for a pistol" within. *Id.* 15:13-16.[1] Officers immediately told Defendant to stop reaching for the gun and then Officer Wilmeth opened the car door and ordered Defendant out of the vehicle. *Id.* 17:3-4, 7-9; 96:5-7. Officer DeTavis told the passenger not to move as he grabbed the gun from the glovebox and gave it to another officer. *Id.* 15:24-25 – 16:1-4; 17:8-14. That officer unloaded the gun, revealing ammunition in the chamber and magazine. *Id.* 17:15-24. After removing the passenger from the car, other officers on the scene determined that she had outstanding arrest warrants. *Id.* 18:9-17; 70:11-12.

At that point, Officer DeTavis searched the vehicle's identification number (VIN) on the driver's side door frame. *Id.* 19:6-7. From his position, DeTavis saw a plastic baggie shoved inside the seam of a panel in the driver's footwell area. *Id.* 19:8-9: 19:22-25 – 20:1-18. Based on his training, DeTavis knew that the baggie contained narcotics and that drivers commonly conceal illegal drugs in the exact location where the baggie was. *Id.* 20:19-25 – 21:1; 85:6-11.

Meanwhile, Officer Wilmeth escorted Defendant to the trunk of Defendant's car and continued asking Defendant his name, paperwork for the car, and a driver's license.

---

[1] At the suppression hearing, Defendant suggested that he was merely reaching for the glovebox to obtain paperwork for the car. However, the only evidence in the record concerning Defendant's movements comes from Officer DeTavis, who testified that Defendant reached for a gun and that, in DeTavis' experience, most gun-carrying motorist immediately inform officers about their possession of a firearm when stopped. The Court credits DeTavis testimony that Defendant was reaching for a gun.

*Id*. 96:7-9, 21-24. Defendant responded that paperwork for the car and his driver's license could be found in his car, but when Wilmeth looked for those items in the vehicle they were not there. Govt.'s Ex. 11, 5:4-7:9; Mot. Hr'g. Tr. 97:14-25. Wilmeth then ran the name and date of birth that Defendant provided him through a law enforcement database, but no information matched that data. *Id*. 98:11-24. Other law enforcement officers on the scene communicated with Defendant in English and Spanish in an attempt to identify him, and it was around this time that Defendant was placed in handcuffs. *Id*. 99:15-20; 100:8-10.

DeTavis alerted Wilmeth to the plastic baggie in the footwell. *Id*. 102:21-23. Wilmeth walked over to the driver's side and observed a white powdery substance on the floor. *Id*. 103:16-17. Wilmeth then called Defendant to him, *id*. 105:1, and as Wilmeth and Defendant stood on the street looking into the open driver's side door, the following exchange occurred:

Wilmeth:   What is that right there?

Defendant:   I don't know.

Wilmeth:   No, is that the coke you were trying to hide before – look at me.

Defendant:   No.

Wilmeth:   So that's not – there's nothing plastic in there?

Defendant:   No, I don't (inaudible)

Wilmeth:   I can pull that out?

Defendant:   No, that's not mine.

…

4

| Wilmeth: | Then what – what plastic bag are you trying to hide while we were trying to stop you? |
|---|---|
| Defendant: | No. |
| Wilmeth: | So you're going to say there's just a random plastic bag? … And then there's random powder right here on the floorboard? |
| Defendant: | Yea, that – check – check those – |
| Wilmeth: | I can check it? |
| Defendant: | Yeah. |
| Wilmeth: | Okay, cool. |
| Defendant: | No, no – no, no, no, no. I – I don't (inaudible) check it. |

Govt.'s Ex. 11 at 12:2-13:9. Although Defendant initially consented to Wilmeth "checking it," video footage shows Wilmeth entering the vehicle as Defendant repeatedly said "no." Def.'s Ex. C, 5:34-37. Wilmeth then extracted the baggie from its concealed location and again asked Defendant if the baggie was his, along with the firearm. Mot. Hr'g. Tr. 105:18-20; Govt.'s Ex. 11 at 13:17-14:13.

Officer Wilmeth then searched Defendant's person and found in his pockets packaging material and pieces of THC "wax." Mot. Hr'g. Tr. 106:10-16. Wilmeth did not recall whether he *Mirandized* Defendant before or after finding these items. *Id*. 106:20-23. Officers then searched the vehicle on the scene and found a large package in the back-seat center console that Wilmeth identified as illegal narcotics. *Id*. 109:12-15, 20-22. At that point they stopped the searched, took custody of the vehicle, and planned to apply for a warrant to search it later. *Id*. 109:17-19.

Two days later, a K-9 detective used a drug sniff dog to search the vehicle's exterior. *Id*. 117:19-23. The dog alerted to the odor of drugs at the driver's side door seam and window opening, and at the rear driver's side door seam. *See* Govt.'s Ex. 15, 5. Based on the dog's alerts, Wilmeth obtained and executed a warrant that same day to search the vehicle. *Id*. at 7. During the search, officers seized the baggie in the footwell and the large package in the back seat, both of which contained methamphetamine. Mot. Hr'g. Tr. 119:7-9; 120:12-16.

Officers' search of the National Crime Information Center (NCIC) eventually showed that the firearm was not stolen. *Id*. 101:14-22. As for the vehicle, it was registered as "title only" to an insurance company in Arizona. *Id*. 101:10-13.

Defendant was charged in a three-count superseding indictment for violating federal drug and gun laws. *See* ECF No. 25. On November 12, 2019, Defendant moved to suppress the drug, gun, and ammunition evidence that police officers retrieved after his encounter with them, claiming that the evidence was obtained in violation of the Fourth Amendment. Defendant also moves to suppress both pre- and post-*Miranda* statements that Defendant contends were elicited in violation of the Fifth Amendment.

On December 11, 2019, Defendant filed a second motion to suppress warrantlessly extracted contents from his cellular phone. However, Defendant's second motion is denied as moot because at the suppression hearing Defendant informed the Court that the Government will not utilize the extractions and acknowledged that his motion is not actionable. *See* Mot. Hr'g. Tr. 187:7-15.

## II.    DISCUSSION

### A. Fourth Amendment Analysis

The Fourth Amendment prohibits unreasonable searches and seizures by law enforcement officers. *See* U.S. Const. amend. IV. To prove that a search violated the Fourth Amendment, the defendant must show that he had a legitimate expectation of privacy in a searched place or item. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). "Fourth Amendment rights are personal and cannot be claimed vicariously. The proponent of a motion to suppress has the burden of adducing facts at the suppression hearing indicating that his own rights were violated by the challenged search." *United States v. Eckhart*, 569 F.3d 1263, 1274 (10th Cir. 2009) (citations and quotation marks omitted).

However, even if a defendant "lacks the requisite possessory or ownership interest in a vehicle to directly challenge a search of that vehicle," he "may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of [his] detention." *United States v. Mosley*, 743 F.3d 1317, 1322-23 (10th Cir. 2014) (internal quotation marks omitted). "To suppress evidence as the fruit of his unlawful detention, a defendant must show, first, that he was seized in violation of his Fourth Amendment rights and, second, that a factual nexus exists between his unlawful seizure and detention and the challenged evidence." *Id.* at 1322 (internal quotation marks omitted). "When a search violates the Fourth Amendment, the exclusionary rule normally dictates that evidence obtained as a result of that search be suppressed." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005).

The Court does not adjudicate or decide Defendant's possessory interest in the vehicle. Instead, the Court addresses only whether Defendant's own seizure was unlawful, which would give him standing to challenge the gun and drug evidence as fruits of the search and seizure. *See Mosley*, 743 F.3d at 1322. This means Defendant must show that (1) the officers unconstitutionally seized him, and (2) "that a factual nexus existed between this unlawful seizure and the discovery of the" contraband in question. *Id*.

### 1) Defendant was not seized in violation of the Fourth Amendment because the initial traffic stop and Defendant's subsequent arrest were supported by probable cause

"Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the detention is brief." *United States v. Zubia-Melendez*, 263 F.3d 1155, 1160 (10th Cir. 2001) (citing *Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)) (other citation omitted). "Therefore, the stop is subject to the constitutional imperative that it not be unreasonable under the circumstances." *Zubia-Melendez*, 263 F.3d at 1160 (quoting *Whren v. United States,* 517 U.S. 806, 810 (1996)) (other citation and internal quotation omitted). "A traffic stop is reasonable under the Fourth Amendment if the officer has either (1) probable cause to believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Ozbirn*, 189 F.3d 1194, 1197 (10th Cir. 1999) (quotation marks and citations omitted). "The defendant bears the burden of proving the challenged seizure violated the Fourth Amendment." *United States v. Muñoz-Nava*, 524 F.3d 1137, 1144 (10th Cir. 2008). If the

defendant establishes a violation, then the government bears the burden of proof by a preponderance of the evidence to justify the warrantless search or seizure. *See Zubia-Melendez*, 263 F.3d at 1160.

Defendant does not challenge the traffic stop at its inception. Rather, Defendant argues that his investigative detention violated the Fourth Amendment because it was prolonged after the purpose of the stop had been accomplished and then escalated to an illegal arrest without probable cause. Specifically, he contends that officers lacked reasonable suspicion to continue to detain him after learning that the car was lawfully registered, the firearm was not stolen, and after he provided officers accurate biographical information.

However, the Court need not determine whether Defendant's investigative detention lacked reasonable suspicion, because at the outset of the traffic stop probable cause existed. Probable cause is sufficient to support an investigative detention. *See Rodriguez-Rodriguez*, 550 F.3d 1223, 1226 (10th Cir. 2008). "An officer has probable cause to arrest if, under the totality of the circumstances, he learned of facts and circumstances through reasonably trustworthy information that would lead a reasonable person to believe that an offense has been or is being committed by the person arrested." *Muñoz–Nava,* 524 F.3d at 1144 (citation and quotation omitted). "Probable cause to arrest does not require facts sufficient to establish guilt, but does require more than mere suspicion." *Id.* (citation and quotation omitted). Where probable cause exists, an arrest does not violate the Fourth Amendment. *See Rodriguez-Rodriguez*, 550 F.3d at 1227 (citing *United States v. Watson,* 423 U.S. 411, 417 (1976)).

Officers had probable cause to stop the vehicle Defendant drove based on an observed violation of the New Mexico offense of "resisting, evading or obstructing an officer." *See* N.M. Stat. Ann. § 30-22-1(C). That statute criminalizes as a misdemeanor "willfully refusing to bring a vehicle to a stop when given a visual or audible signal to stop, whether by hand, voice, emergency light, flashing light, siren or other signal, by a uniformed officer in an appropriately marked police vehicle." *Id.* Although New Mexico state court decisions specifically addressing what constitutes a violation of § 30-22-1(C) are rare, it appears that a motorist violates § 30-22-1(C) by "driv[ing] off" after being stopped by a person the motorist knows is a law enforcement officer or by not "promptly pull[ing] off to the side of the road and stop when [the motorist] notices a law enforcement vehicle that has its emergency lights and/or sound equipment engaged." *State v. Montaño*, 2018-NMCA-047, ¶¶ 20, 42, 423 P.3d 1, 15, 16.

Here, Defendant did not promptly pull over in response to officers' visible lights and sirens. Instead, he continued traveling for over one-half of a mile and passed six or seven streets on which he could have turned off. Defendant contends that he was unsure if Officers Wilmeth and DeTavis were truly police officers because they traveled in an unmarked unit. However, DeTavis testified that in his experience executing traffic stops in both marked and unmarked police cars, drivers "typically pull over," and associate flashing lights and sirens with police officers. Mot. Hr'g. Tr. 46:18-19. Officers therefore had probable cause to stop and arrest Defendant for violating N.M. Stat. Ann. § 30-22-1(C).

Officers also had probable cause to arrest Defendant for driving without a license contrary to N.M. Stat. Ann. § 66-5-16 ("Every licensee shall have the licensee's driver's

license in the licensee's immediate possession at all times when operating a motor vehicle and shall display the license upon demand of a magistrate, a peace officer or a field deputy or inspector of the division."). When Officer Wilmeth asked Defendant to provide identity, Defendant could not provide a license or authority to drive the vehicle. He instead gave the officer inconsistent answers about the location of his driver's license, and in his reply brief Defendant admits that he did not have in his immediate possession a driver's license displayable on demand.

He contends, nonetheless, that New Mexico law prohibits custodial arrests for traffic offenses that are punishable by issuance of a citation. *See* Def.'s Reply Br. at 6-7 (citing and quoting *State v. Bricker*, 2006-NMCA-052, ¶ 9, 139 N.M. 513, 516, 134 P.3d 800, 803). However, federal courts do not apply state law in a federal criminal prosecution. *See Elkins v. United States*, 364 U.S. 206, 223-24 (1960); *United States v. Sawyer*, 441 F.3d 890, 899 (10th Cir 2006). The Fourth Amendment allows police to make custodial arrests if they have probable cause to believe that the person has committed an offense, even an exceedingly minor one. *See Atwater v. City of Lago Vista,* 532 U.S. 318, 354 (2001) (upholding custodial arrest for seatbelt violation).

Because Defendant's failure to immediately stop his car and then produce a driver's license gave the officers probable cause to arrest him, the Court need not decide whether Defendant also violated N.M. Stat. Ann. § 66-3-18(B) by not clearly displaying the vehicle's temporary registration tag or whether Defendant concealed his identity in violation of N.M. Stat. Ann. § 30-22-3. In other words, no violation of Defendant's Fourth

Amendment rights occurred because early in the police encounter the officers had the requisite probable cause to arrest him. *See Atwater,* 532 U.S. at 354.

### a) The search of Defendant's person was lawful

One exception to the Fourth Amendment's warrant requirement is a warrantless "search the person of the accused when legally arrested." *United States v. Knapp*, 917 F.3d 1161, 1165 (10th Cir. 2019) (quoting *Weeks v. United States*, 232 U.S. 383, 392 (1914)). A police officer who makes a lawful custodial arrest may search both the arrestee's person and the area within the arrestee's "immediate control." *Id*. (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). "This authority is justified by the need to disarm the suspect and preserve evidence." *Id*. (citing *United States v. Robinson*, 414 U.S. 218, 234 (1973)). The right to search an arrestee incident to a lawful arrest includes the right to search the pockets of the arrestee's clothing. *See Robinson*, 414 U.S. at 234. Moreover, an officer may warrantlessly seize any article discovered during such a search, even if it relates to a crime unrelated to the arrest, but only if the officer has probable cause to believe that the object constitutes constitutionally seizable evidence, *i.e.* that the article is contraband. *See id*. (arresting officer properly seized heroin discovered during the search of a traffic violator).

Here, Officer Wilmeth had the right to search Defendant's person and pockets as a search incident to arrest. The discovery of a large plastic package and THC from Defendant's pockets gave him probable cause to believe that these items were contraband. The search of Defendant's person was a lawful search incident to arrest and did not violate the Fourth Amendment.

**b) The initial seizure of the gun and search of its serial number were lawful**

The analysis of officers' initial seizure of the gun from the glovebox is governed by *Michigan v. Long*, 463 U.S. 1032 (1983). *Long* extended the principles in *Terry v. Ohio*, 392 U.S. 1 (1968) to uphold a weapons search of the passenger compartment of a lawfully stopped vehicle. Recognizing that traffic stops are "especially fraught with danger to police officers," *Long*, 463 U.S. at 1047, the Court held that officers may warrantlessly search a vehicle passenger compartment as long as the search is "limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief … that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id*. at 1049. Moreover, when a stop involves one or more passengers, that fact "increases the possible sources of harm to the officer," *Maryland v. Wilson*, 519 U.S. 408, 413 (1997), as "the motivation of a passenger to employ violence ... is every bit as great as that of the driver." *Id*. at 414.

Here, officers complied with *Long* by quickly removing the gun from the vehicle after Defendant reached for the weapon because it was within the passenger's potential reach, creating a dangerous situation. Defendant counters that because New Mexico generally permits its citizens to carry firearms, the risk of danger posed by the firearm was eliminated. But the constitutionality of a weapons search does not depend on the legality of the firearm's possession – the limited purpose of a such a search is "to allow the officer to pursue his investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not carrying a concealed weapon violated

any applicable state law." *Adams v. Williams*, 407 U.S. 143, 146 (1972). Officers therefore acted lawfully by dispossessing Defendant or the passenger of the gun.

Defendant next contends (for the first time in his reply brief) that officers illegally "searched" the gun by running its serial numbers to check whether it was stolen. Defendant relies on *Arizona v. Hicks,* 480 U.S. 321 (1987), where the Supreme Court held that an officer violated the defendant's Fourth Amendment rights when the officer – although lawfully in the defendant's apartment in response to a shooting that had just taken place – picked up some stereo components without a warrant to see their serial numbers and determine whether they had been stolen. *Id.* at 323-26. The Court held that inspecting parts of the equipment that came into view during the lawful search was not a separate search because it would have produced no additional invasion of the defendant's privacy interests. *Id*. at 324-25. But "taking action, unrelated to the objectives of the authorized intrusion, which exposed to view concealed portions of the apartment or its contents, did produce a new invasion" of the defendant's privacy that were not justified by exigent circumstances. *Id*. at 325.

Defendant's reliance on *Hicks* is misplaced because it is important to remember that officers were properly in possession of the gun because of their lawful weapons search of the vehicle. "Police officers have an affirmative duty to utilize the least intrusive methods reasonably available to dispel their suspicions," and examining a gun and searching its serial numbers "in an attempt to confirm or dispel their suspicions of criminal behavior," is quick and effective. *United States v. Watts*, 7 F.3d 122, 127 (8th Cir. 1993) (citations omitted); *see also United States v. Wallace,* 889 F.2d 580, 583 (5th Cir. 1989) (holding that

the police having "legally come into possession of the gun ... were entitled, if not expected, to note and to record its serial number.") Because the firearm was obtained through a weapons search and lawfully in the officer's possession, "the 'plain view' analysis of *Hicks,* which involves the extent to which officers can manipulate items in their presence but not their possession, is inapplicable." *Watts*, 7 F.3d at 127. Officers therefore were justified in seizing the gun and did not require any new or separate reason to examine it.

### c) The automobile exception justified both searches of the vehicle

A warrantless vehicle search "is permissible if there is probable cause to believe that the vehicle contains contraband." *United States v. Edwards,* 632 F.3d 633, 645 (10th Cir. 2001). This is referred to as the "automobile exception" to the Fourth Amendment's warrant requirement. *See Carroll v. United States*, 267 U.S. 132, 158-59 (1925) (creating the exception); *United States v. Beckstead*, 500 F.3d 1154, 1165 (10th Cir. 2007). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Edwards*, 632 F.3d at 645 (quotations omitted). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross,* 456 U.S. 798, 825 (1982); *United States v. Bradford,* 423 F.3d 1149, 1160 (10th Cir. 2005) ("Once probable cause to search is established, the officer may search the entire vehicle, including the trunk and all containers therein that might contain contraband."). "In determining whether probable cause exists, an officer 'may draw inferences based on his own experience.'" *United States v. Mercado*,

307 F.3d 1226, 1230 (10th Cir. 2002) (quoting *Ornelas v. United States*, 517 U.S. 690, 700 (1996)).

Here, the officers testified that illegal narcotics are commonly trafficked in baggies and concealed in the manner Defendant allegedly hid the bag. Moreover, Officer Wilmeth observed what seemed to be drug residue on the floor near the baggie. This information gave officers probable cause to believe the vehicle contained illegal drugs. Once probable cause existed to search the vehicle, "it justifie[d] the search of every part of the vehicle and its contents that may conceal the object of the search," *Ross,* 456 U.S. at 825, including the rear center console because it could conceal small items like drugs. *See Wyoming v. Houghton,* 526 U.S. 295, 302 (1999) ("When there is probable cause to search for contraband in a car, it is reasonable for police officers ... to examine packages and containers without a showing of individualized probable cause for each one.").[2]

Defendant nonetheless maintains that officers had no reason to continue searching the car once they learned that the car was lawfully registered, the firearm was not stolen, and Defendant provided accurate biographical information. To be sure, "an officer's authority to seize a motorist 'ends when tasks tied to the traffic infraction are—or reasonably should have been—completed.'" *United States v. Mayville*, No. 19-4008, 2020

---

[2] There is no need to determine whether officers complied with *Arizona v. Gant*, 556 U.S. 332 (2009), which establishes that a search of a vehicle incident to a recent occupant's arrest is justified "only when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or when "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle." *Id.* at 343. Because the automobile exception to the warrant requirement justified the search, the Court does not analyze whether officers conducted a lawful search of the vehicle incident to Defendant's arrest.

WL 1684057, at *4 (10th Cir. Apr. 7, 2020) (quoting *Rodriguez v. United States*, 575 U.S. 348, 354 (2015)). However, the traffic stop had not been completed. Officer DeTavis discovered the baggie while he was searching the VIN, and he then alerted Officer Wilmeth to the baggie while Wilmeth was also verifying the VIN and attempting to identify Defendant and his authority to drive the vehicle. Thus, the investigation was not over by the time DeTavis saw the bag.

The automobile exception likewise disposes of Defendant's challenge to the second search of the vehicle conducted while in police custody. When, as here, "police officers have probable cause to believe there is contraband inside an automobile that has been stopped on the road, the officers may conduct a warrantless search of the vehicle, even after it has been impounded and is in police custody." *Michigan v. Thomas,* 458 U.S. 259, 261 (1982) (per curiam). Indeed, "the Supreme Court has repeatedly held that 'police officers with probable cause to search an automobile at the scene where it was stopped could constitutionally do so later at the station house without first obtaining a warrant.'" *United States v. Tapia*, No. 09-3060, 2010 WL 299245, at *5 (10th Cir. Jan. 27, 2010) (quoting *Texas v. White,* 423 U.S. 67, 68 (1975) (per curiam)).

Nor does the fact that two days passed between the searches render the second search unreasonable. *See United States v. Donahue*, 764 F.3d 293, 300 (3d Cir. 2014) (five day delay between the time that the government seized a vehicle and then searched it was "immaterial" because officers validly searched the vehicle under the automobile exception); *United States v. Gastiaburo,* 16 F.3d 582, 586 (4th Cir. 1994) (upholding

warrantless search of a vehicle 38 days after impoundment); *United States v. McHugh,* 769 F.2d 860, 865–67 (1st Cir. 1985) (seven days). [3]

Because the seizure of Defendant was lawful under the Fourth Amendment, the gun and drug evidence will not be suppressed as fruits of the poisonous tree. The Court therefore does not address the Government's argument that this evidence would have been inevitably discovered in the second vehicle search despite a constitutional violation. No such violation occurred and the Court does not analyze the Government's inevitable discovery argument.

### B. Fifth Amendment Analysis

The Fifth Amendment states that no individual "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. As interpreted by *Miranda v. Arizona*, 384 U.S. 436 (1966), the Fifth Amendment requires that an individual subject to custodial interrogation be informed clearly and unequivocally: (1) that he "has the right to remain silent"; (2) that "anything said can and will be used against the individual in court"; and (3) that "he has the right to consult with a lawyer and to have the lawyer with him during interrogation;" and (4) "that if he is indigent[,] a lawyer will be appointed to

---

[3] The Government also argued that officers validly inventory searched the vehicle, which is an exception to the warrant requirement. *See South Dakota v. Opperman*, 428 U.S. 364 (1976). However, the Government did not introduce standardized impoundment policies into the evidentiary record and thus failed to carry its burden to show that officers conducted an inventory search.

Moreover, the Government argued that Defendant consented to Wilmeth extracting the baggie from the car. *See* Govt.'s Resp. Br., ECF No. 38, 17. But because Government abandoned this argument at the suppression hearing, the Court does not consider it. *See* Mot. Hr'g. Tr. 181:13-24.

represent him," *id.* at 467–73. These warnings form "an absolute prerequisite to interrogation." *Id.* at 471.

"[T]wo requirements must be met before *Miranda* is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993). A person is "in custody" when he has been arrested or his freedom is curtailed to a degree associated with a formal arrest. *See Stansbury v. California*, 511 U.S. 318, 322 (1994) (per curiam); *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam). The relevant inquiry for determining whether an individual is "in custody" is whether a reasonable person in that position would "believe her freedom of action had been curtailed to a 'degree associated with formal arrest.'" *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quoting *Beheler*, 463 U.S. at 1125 and *Berkemer v. McCarty,* 468 U.S. 420, 440 (1984)). A suspect can be placed in police "custody" for purposes of *Miranda* before he has been "arrested" in the Fourth Amendment sense. *Berkemer*, 468 U.S. at 441.

The questioning that occurs during a routine traffic stop generally requires no *Miranda* warnings because these everyday police-motorist encounters are brief, non-threatening, and conducted in the presence of others. *See id.* at 437–38. But not all traffic stops are routine. "[L]aw enforcement officials may create the custodial interrogation that *Miranda* contemplates 'by employing an amount of force that reache[s] the boundary line between a permissible *Terry* stop and an unconstitutional arrest.'" *United States v. Curls*, 219 F. App'x 746, 754 (10th Cir. 2007) (quoting *Perdue*, 8 F.3d 1459)). As the *Berkemer* Court explained, "if a motorist who has been detained pursuant to a traffic stop thereafter

is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." 468 U.S. at 440.

The test for determining whether a roadside traffic stop amounts to a custodial interrogation subject to *Miranda* is whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Id.* at 437. The Tenth Circuit has avoided "hard line rules," *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993), to determine whether a suspect is in custody. The following considerations guide the court's analysis: First, "the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will." *Id.* Second, "the nature of questioning," where "prolonged accusatory questioning is likely to create a coercive environment from which an individual would not feel free to leave." *Id.* Third, the court uses "the following helpful guideposts" to "check whether police dominate the encounter," *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008), namely:

> [S]eparation of the suspect from family or colleagues who could offer moral support; isolation in nonpublic questioning rooms; threatening presence of several officers; display of a weapon by an officer; physical contact with the subject; and an officer's use of language or tone of voice in a manner implying that compliance with the request might be compelled.

*Id.*

### a) Defendant was under custodial interrogation before Officer Wilmeth *Mirandized* Defendant

Here, Defendant was not subject to custodial interrogation when officers asked him for his identity and authority to drive the car; these are "words or actions on the part of the police ... normally attendant to arrest and custody are not interrogation." *United States v.*

*Yepa*, 862 F.3d 1252, 1257 (10th Cir. 2017). However, the record shows that Officer Wilmeth's questioning of Defendant when he beckoned Defendant to the vehicle occurred during a roadside stop that was coercive enough to require *Miranda* warnings before any interrogation. A reasonable person in Defendant's position would not have felt free to leave. Defendant was never told he was free to leave. Before questioning, Defendant was removed from the vehicle, handcuffed, and denied access to the car, suggesting a reasonable person would not have felt free to leave.

The second factor – the purpose of the questioning – also shows that Defendant was in custody. Immediately after Wilmeth summoned Defendant to the car, he accusatorily asked him "what is that," while pointing at the baggie. Wilmeth repeatedly asked Defendant if the baggie contained "coke" that Defendant was "trying to hide" from officers. Def.'s Ex. G-1, 5:18. A reasonable person would not have felt free to leave after being repeatedly asked by a police officer whether drugs were in the vehicle he drove. Additionally, the traffic stop lasted at least ten minutes or more, which suggests that Defendant was in custody. *See Berkemer*, 468 U.S. at 441 & n.34 (contrasting routine traffic stop with one in which the driver "was detained over one-half hour.") Moreover, Wilmeth *Mirandized* and arrested Defendant at the conclusion of the questioning, indicating Defendant was in custody.

The third factor – whether police dominated the encounter – weighs in favor of a finding of custody. Video footage from the stop shows numerous officers on the scene. Even though many of these officers had no contact with Defendant and the questioning occurred on a public roadside, the fact that the questioning occurred at nighttime among

numerous officers while Defendant was handcuffed made it a police dominated atmosphere. Officer Wilmeth's language and tone of voice "impl[ied] that compliance with the request might be compelled." *Jones*, 523 F.3d at 1240. For instance, Wilmeth told Defendant that he was "starting off on a bad foot," when Wilmeth did not get the answer he wanted and told Defendant that he "need[ed] to start being honest," after Defendant said that he did not know what was inside the bag. Def.'s Ex. G-1 at 8:18-19. Considering the totality of the circumstances, Defendant was in custody when Officer Wilmeth summoned him to the vehicle and began asking him questions about the alleged drugs and gun in the car.

Wilmeth likewise "interrogated" Defendant for *Miranda* purposes. In determining whether police questioning constitutes "interrogation," courts ask whether the officer questioning the suspect knew or reasonably should have known that the questions were "reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). By the time Wilmeth began questioning Defendant, the investigation had clearly shifted from being a traffic investigation to a drug investigation. Wilmeth's questioning therefore was an attempt "to discuss the crime under investigation" and his repeated questions "were reasonably likely to produce an incriminating response." *United States v. Rambo*, 365 F.3d 906, 909–10 (10th Cir. 2004).

Because Defendant was under custodial interrogation, the procedural protections of *Miranda* applied. Although Defendant did not identify precisely the self-incriminating statements that he believes are subject to the exclusionary rule, the Court suppresses any

such statements that Defendant made after Officer Wilmeth beckoned Defendant to the vehicle, since at that point Defendant was under custodial interrogation.

### b) Defendant understood the *Miranda* warnings once they were given

Finally, Defendant also moves to suppress any post-*Miranda* statements. He argues that by the time Wilmeth did administer *Miranda* warnings, Defendant did not understand the substance of the warnings because they were conveyed in English, a language with which he struggled. "A suspect who has been advised of his rights against self-incrimination 'may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently.'" *United States v. Hernandez*, 913 F.2d 1506, 1509 (10th Cir. 1990) (quoting *Miranda,* 384 U.S. at 444) (other citation omitted). "To determine whether a suspect's waiver of his *Miranda* rights was intelligent, we inquire whether the defendant knew that he did not have to speak to police and understood that statements provided to police could be used against him." *Hernandez*, 913 F.2d at 1510. Notably, while "language barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights," if the suspect's prior "communications with [officers] in English indicated that he did in fact understand English" a district court may find that the suspect intelligently waived *Miranda* rights. *Id*.

The Government has shown that the *Miranda* warnings given to Defendant were sufficient to allow him to make a voluntary and knowing waiver of his rights. The Government's witnesses testified that Defendant understood them in their interactions with him. Indeed, Defendant responded coherently to Wilmeth's questions concerning personal

identifying information and Defendant's authority to drive the vehicle. The Court's review of the video footage and corresponding transcripts shows that Defendant was able to purposefully spell his name and provide his date of birth in English. While Defendant may not be a fluent English speaker, binding caselaw "does not require an extensive vocabulary, complex sentence structure, or fluency in English for *Miranda* warnings in English to be valid." *United States v. Benally*, 350 F. Supp. 3d 1183, 1193 (D.N.M. 2018). Like the suspect in *Hernandez*, Defendant repeatedly communicated with officers in English, which is important because the "Tenth Circuit has repeatedly affirmed district court findings that a defendant sufficiently understood *Miranda* warnings in English when the record shows that the defendant responded appropriately to officers in English." *Benally*, 350 F. Supp. 3d at 1191 (collecting cases).

## III.    CONCLUSION

**IT IS THEREFORE ORDERED that** Defendant Federico Mazon's "Motion to Suppress Evidence Derived as a Result of an Invalid Search and Seizure and to Suppress Statements Obtained in Violation of *Miranda v. Arizona*, and Memorandum in Support Thereof," **(ECF No. 28)** is **GRANTED** to the extent it seeks suppression of pre-*Miranda* custodial statements, but otherwise **DENIED**;

**IT IS FURTHER ORDERED that** Defendant's "Motion to Suppress Evidence Derived as a Result of a Warrantless and Unlawful Search of his Telephone and Memorandum in Support Thereof" **(ECF No. 36)** is **DENIED** as **MOOT**.

**IT IS SO ORDERED**.


_____
HON. JUDITH C. HERRERA
SENIOR UNITED STATES DISTRICT JUDGE